J-S22015-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS OF: A.S. IN AND TO: G.D., A MINOR | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>:<br>:<br>: |
| APPEAL OF: A.S., MOTHER | :<br>:<br>:<br>: |
| | : No. 714 EDA 2026 |

Appeal from the Decree Entered February 5, 2026
In the Court of Common Pleas of Carbon County
Orphans' Court at No(s):  24-OC-0010

| | |
|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS OF: A.S., AND J.M. IN AND TO: E.D., A MINOR | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>:<br>:<br>: |
| APPEAL OF: A.S., MOTHER | :<br>:<br>:<br>: |
| | : No. 715 EDA 2026 |

Appeal from the Decree Entered February 5, 2026
In the Court of Common Pleas of Carbon County
Orphans' Court at No(s):  24-OC-0011

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:         **FILED JULY 22, 2026**

A.S. ("Mother") appeals from the decrees which involuntarily terminated

her parental rights to her two sons: G.D., born in January of 2019, and E.D.,

born in May of 2016 (collectively, "the Children").[1]  After careful review, we affirm.

We gather the relevant factual and procedural history of this matter from the certified record.  This family first became known to Carbon County Children and Youth Services ("CYS") in May of 2020, after it received a report alleging that Mother was addicted to illegal drugs, did not have the parenting skills to appropriately manage then-four-year-old E.D.'s behavioral issues, and was the aggressor in a domestic violence incident involving the Children's maternal grandmother.  *See* N.T., 11/6/25, at 11.  While CYS began providing services to the family, the Children remained in Mother's care.  *See id.* at 9-11.  In July of 2020, however, the juvenile court adjudicated the Children dependent, removed them from Mother's custody, and placed them in kinship foster care.  *See id.*; *see also* Petitions for Termination, 4/5/24, at 2 (unpaginated).  During the ensuing dependency proceedings, the Children went through multiple foster placements.  *See* N.T., 11/6/25, at 10-11, 13, 38, 41-42.  At the time of the subject hearing, they were each placed in separate, pre-adoptive foster homes.  *See id.* at 33-34, 38, 41-43.

---

[1]  J.M. is the biological father of E.D. and G.D.'s father is unknown.  *See* N.T., 11/6/25, at 9-10, 19.  By the same decree that terminated Mother's parental rights to E.D., the orphans' court also involuntarily terminated the parental rights of J.M.  *See* Final Decree (E.D.), 2/5/26, at 1.  The orphans' court did the same for "John Doe" with respect to the unknown father of G.D.  Final Decree (G.D.), 2/5/26, at 1.  Neither J.M. nor any other unknown father appealed the termination decrees or participated in this appeal.

The juvenile court established the Children's initial permanency goals as reunification and held regular permanency review hearings. *See* Petitions for Termination, 4/5/24, at Exhibit B. In furtherance of reunification, the juvenile court ordered Mother to, *inter alia*, submit to drug screens and complete family counseling and parenting classes. *See id.* at 3. Additionally, CYS created a service plan that set forth various objectives for Mother, including but not limited to: (1) undergo drug and alcohol and mental health evaluations and follow all resulting recommendations; (2) participate in random drug screens; (3) complete parenting education; and (4) participate in supervised visitations with the Children. *See* N.T., 11/6/25, at 12.

According to CYS casework supervisor Megan Croizier, Mother did not consistently comply with, or successfully complete, any of her objectives during the course of over five years of reunification services. *See id.* at 12, 22. Upon CYS's request, the juvenile court changed the Children's respective permanency goals from reunification to adoption on November 29, 2022. *See id.* at 23. Mother did not appeal the goal changes.

During the Children's dependencies, Mother was in and out of prison and court-ordered rehabilitation centers for serial violations of probation related to her use of illegal drugs, including methamphetamines. *See id.* at 12-15, 18-21, 26, 29-30, 33, 46-49; *see also* Orders, 7/9/25. Further, Mother baselessly accused several of the Children's foster parents of maltreating them and called the police to perform needless welfare checks on multiple

occasions. **See** N.T., 11/6/25, at 13, 16-17, 24. Ultimately, this behavior led the juvenile court to order that the Children's whereabouts be kept confidential from Mother beginning in September of 2023. **See id.** at 24-25.

CYS organized in-person supervised visitations for Mother and the Children when Mother's situation permitted it. **See** N.T., 11/6/25, at 15-17, 22, 25-26, 28, 35-37. Nevertheless, Mother did not consistently participate in these visitations; additionally, she also appeared late on other occasions, which resulted in cancellations. **See id.** at 15-17, 22-23, 28. During some of the visits in which Mother did engage, CYS observed her to be under the influence. **See id.** at 16-17. Therefore, the court ordered Mother to produce clean drug screens before having visits. **See id.** at 22. CYS also arranged for Mother to have phone and video calls with the Children during her periods of confinement. **See id.** at 13-14, 19, 36. However, Mother was also not consistent in attending these virtual visits and regularly logged in late, initiated phone calls outside of the scheduled timeframes, or failed to appear entirely. **See id.** at 13, 16-17. The last visit Mother successfully attended with the Children was in February 2024. **See id.** at 39, 49.

In addition, CYS had ongoing concerns about Mother's interactions with the Children during the visitations, particularly regarding what Mother would say and how she would act towards them. **See id.** at 13, 19-20. The record reflects that the Children were adversely affected by both Mother's inconsistent attendance at supervised visits and the limited interactions that

actually occurred. *See id.* at 13, 28. Specifically, G.D. would become withdrawn and E.D. would become aggressive. *See id.* at 28-29. Largely based upon these concerns, the juvenile court granted CYS's request to cease all contact between Mother and the Children in September 2024. *See id.*

Contemporaneously, on April 5, 2024, CYS filed petitions to involuntarily terminate Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b).[2] On November 6, 2025, the orphans' court held an evidentiary hearing.[3] At this time, G.D. was six years old and E.D. was nine years old. The Children's best and legal interests were represented by Mark Combi, Esquire.[4] Mother failed to appear at the termination hearing, but

_____

[2] CYS filed an amended petition with respect to G.D. on September 30, 2024, because the original petition incorrectly listed J.M. as G.D.'s father. The amended petition corrected this mistake and listed "John Doe" as the unknown father. Amended Petition, 9/30/24, at 1 (unpaginated).

[3] The orphans' court granted numerous continuance requests related to CYS serving notice of the termination proceedings to G.D.'s unknown father by publication.

[4] Our Supreme Court has mandated that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). When one attorney is appointed to the dual role of representing a child's best and legal interests, this Court must also *sua sponte* review whether "the orphans' court determined that the child's best interests and legal interests did not conflict." *Id.* at 1236. The conflict determination must typically be conducted **before** counsel's appointment and should appear within the orders appointing counsel. *See id.* It is well-established "that a single attorney cannot represent a child's best interests and legal interests if those interests conflict." *Id.*
*(Footnote Continued Next Page)*

she was represented by counsel.  In support of termination, CYS presented the testimony of Ms. Croizier.

By decrees dated and filed on February 5, 2026, the orphans' court involuntarily terminated Mother's parental rights to the Children pursuant to Section 2511(a)(1), (2), (5), and (b).  On March 9, 2026, Mother timely filed

_____

Here, on September 14, 2024, the Honorable Joseph J. Matika entered orders appointing Attorney Combi, the Children's guardian *ad litem* ("GAL") in the dependency proceedings, to represent their legal interests in the termination hearing.  **See** Orders, 9/13/24.  These orders did not make a conflict determination.  **See id.**  The orders directed Attorney Combi to notify the orphans' court if there were a conflict between the Children's best and legal interests.  **See id.**  We note that this Court has recently held that this type of order fails to comply with **K.M.G.  See In re Adoption of A.C.M.**, 333 A.3d 704 (Pa. Super. 2025).

However, in July of 2025, Judge Matika recused himself from the termination proceedings because he presided over Mother's involvement in drug treatment court.  **See** Orders, 7/9/25.  Thereafter, the Honorable Steven R. Serfass was assigned to the matter.  At the termination proceeding, after hearing from Attorney Combi, Judge Serfass made the following finding on the record in open court: "The [c]ourt finds that the best interests of the child, either child, do not conflict with the legal interests of either child and that [Attorney] Combi can proceed as both legal counsel and [GAL] here today."  N.T., 11/6/25, at 6-7.

Under the circumstances presented in this case, we conclude that **A.C.M.** is critically distinguishable due to the change in jurists from the entry of the appointment order and commencement of the termination hearing along with the explicit conflict finding by Judge Serfass on the record at the beginning of the hearing.  **See In the Int. of R.D.**, ___ A.3d ___, 2026 WL 1757004, *5 (Pa. Super. 2026) (vacating and remanding a termination decree after holding that the orphans' court erred by failing to make a conflict determination prior to the dual attorney's appointment "or at any other time during the TPR proceedings.") (citing **K.M.G.**, 240 A.3d at 1234-36; **A.C.M.**, 333 A.3d at 708).  Thus, we deem the mandates of Section 2313(a) and **K.M.G.** fulfilled.

notices of appeal and contemporaneous concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5] On March 26, 2026, this Court consolidated these cases *sua sponte*. The orphans' court filed separate Rule 1925(a) opinions for each child on April 8, 2026.

On appeal, Mother presents the following issue for our review:

1. Did the [orphans'] court commit legal error and an abuse of discretion when it terminated the parental rights of the biologic[a]l mother as to [the] Children in the complete absence of any evidence whatsoever presented by [CYS] as to the existence of a bond between the biological mother and [the] Children and the effects of breaking that bond?

Mother's Brief at 6 (unnecessary capitalization omitted).[6]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility

---

[5] Although the orphans' court filed the termination decrees on February 5, 2026, our review reveals that there is no indication on the docket that notice was provided as required by Pa.R.C.P. 236(a)-(b). As such, Mother's time in which to file a timely notice of appeal was never actually triggered. **See Cardwell v. Chrysler Financial Corp.**, 804 A.2d 18, 23 (Pa. Super. 2002) (citing Pa.R.A.P. 903(a)). Consequently, Mother's time in which to file a concise statement was also never triggered. **See** Pa.R.A.P. 1925(a)(2)(i) (requiring in children's fast track cases that "[t]he concise statement of errors complained of on appeal shall be filed and served with the notice of appeal."); **see also In re L.M.**, 923 A.2d 505, 510 (Pa. Super. 2007) (holding that an appellant's failure to file a timely concise statement in a parental termination case was excused due to the orphans' court's lack of compliance with Rule 236). As such, we conclude that Mother's filings are timely.

[6] Attorney Combi joined the brief of CYS advocating for this Court to affirm the subject decrees.

determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by clear and convincing evidence, the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and

welfare. ***See In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013); ***see also*** 23 Pa.C.S.A. § 2511(b). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In this case, the orphans' court terminated Mother's parental rights to the Children pursuant to Section 2511(a)(1), (2), (5), and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of

the parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (b).

Ordinarily, we would begin our review in this context by considering whether termination of Mother's parental rights was warranted pursuant to Section 2511(a). Mother, however, has not challenged the orphans' court's findings that the involuntary termination of her parental rights was warranted pursuant to Section 2511(a)(1), (2), and (5) in either her concise statement of errors or her appellate brief. *See* Concise Statement, 3/9/26, at 1; Mother's Brief at 6, 10-17. Accordingly, Mother has waived any challenge to the orphans' court's findings with respect to Section 2511(a)(1), (2), or (5). *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (holding that an appellant waived any claims pursuant to Section 2511(a) by failing to include such issues in their concise statement and brief).

As such, the only provision of the Adoption Act that is pertinent to this appeal is Section 2511(b), which is set forth above. *See* 23 Pa.C.S.A. §

2511(b). The orphans' court's Section 2511(b) inquiry must include consideration for the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). With respect to the bond analysis, we have explained:

> The orphans' court must determine whether the parent and child share an emotional bond and assess whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." [*In the Int. of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023)]. If a bond exists, the court must ascertain the effect upon the child of severing the bond. *Id.* Because the severing of any parent-child bond may be emotionally painful for a child, the orphans' court cannot preclude termination based solely on evidence of an "adverse" or "detrimental" impact to the child. *Id.* at 1110-11. Instead, focusing upon the "child's development, and mental and emotional health," the orphans' court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.*

*In re Adopt. of G.W.*, 342 A.3d 68, 90 (Pa. Super. 2025) (*en banc*). The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008).

Nevertheless, the Section 2511(b) analysis does not end with the evaluation of the parent-child bond. *See G.W.*, 342 A.3d at 91. The orphans' court must also consider:

> the child's need for permanency and length of time in foster care . . .; whether the child is in a pre[-]adoptive home and bonded

with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* These considerations are all of "primary importance in the Section 2511(b) analysis" and "may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare." *K.T.*, 296 A.3d at 1109. It is within the orphans' court's discretion to "place appropriate weight on each factor present in the record" when conducting "a full [Section 2511](b) analysis focused upon the child." *Id.* at 1113. Of particular importance, the orphans' courts "must consider the matter from each child's perspective, placing the child's 'developmental, physical, and emotional needs and welfare above concerns for the parent.'" *G.W.*, 342 A.3d at 90 (citing *K.T.*, 296 A.3d at 1105-06).

Mother argues that CYS failed to meet its evidentiary burden pursuant to Section 2511(b). *See* Mother's Brief 15-16. Specifically, Mother asserts that Ms. Croizier provided no testimony about the bond between Mother and the Children. *See id.* at 15. Since CYS relied principally upon Ms. Croizier's testimony to support their requests for termination, Mother contends that the orphans' court could not conduct an adequate Section 2511(b) analysis. *See id.* at 15-16. In the alleged absence of sufficient evidence, Mother asserts that the orphans' court abused its discretion in concluding termination was warranted pursuant to Section 2511(b). *See id.* Upon review, we disagree.

The orphans' court explained its findings and conclusions pursuant to Section 2511(b), as follows:

> This court heard sufficient testimony to discern the nature and status of the bond between Mother and the Children. Based on the evidence, we submit that there is no bond. Even if we were to find that some sort of bond does exist, it is not one that is necessary or beneficial to the Children's welfare. Rather, any bond that may exist is clearly harmful. The Children were approximately four and one and one half years old at the time CYS became involved. In the over five and a half years that the Children have been in CYS custody, Mother has maintained only minimal contact. While some visits did occur that were unproblematic, many left the Children feeling angry or upset or withdrawn. Mother has been in and out of prison and treatment centers on a regular basis throughout the entire time the Children were in CYS custody. We also note that the time Mother has spent in treatment centers was either as a condition of being released from incarceration or as a stipulation of her probation.
>
> . . . The minimal contact that Mother has had with the Children has negatively affected their well-being, and has caused problems with their foster families, which resulted in a change of placement. Despite these difficulties, the Children are doing well in their current placements . . .
>
> It has been over two years since Mother has seen the Children . . . Termination of Mother's parental rights will not cause the Children to suffer extreme emotional consequences. Rather, any detriment the Children may experience from terminating Mother's parental rights is heavily outweighed by the harm of continuing the relationship and preventing the Children from being adopted and attaining permanency.

Orphans' Court Opinion (G.D.), 4/8/26, at 12-15; Orphans' Court Opinion, (E.D.), 4/8/26, at 12-14 (cleaned up). The orphans' court's findings are well-supported by the certified record.

Preliminarily, the crux of Mother's argument is that there is no record evidence regarding the bond between Mother and the Children because

counsel for CYS did not specifically pose a question to Ms. Croizier using the word "bond." Mother's Brief at 15-16. As discussed further *infra*, we reject the premise of this argument insofar as our review indicates that Ms. Croizier did, in fact, testify in a revealing and substantive manner regarding the lack of a bond between Mother and the Children. ***See generally*** N.T., 11/6/25. Even if counsel for CYS or Ms. Croizier did not utilize the specific term "bond" during her testimony, our precedent does not require the formalistic use of specific words or questions. ***See G.W.***, 342 A.3d at 90. Rather, our caselaw requires the orphans' court to make an independent determination as to whether a parental bond exists and "assess" whether that bond is "necessary and beneficial" to the child. ***Id.*** Moreover, this argument further fails because "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." ***K.Z.S.***, 946 A.2d at 762-63.

Here, Ms. Croizier's testimony confirmed that no bond exists between the Children and Mother. Ms. Croizier detailed the inconsistent communication and visitation that Mother had with the Children. ***See*** N.T., 11/6/25, at 13-17, 19, 22-23, 25-26, 28, 35-37. She also testified that the last visit Mother had with the Children was in February of 2024. ***See id.*** at 39, 49. The juvenile court eventually ceased contact between the Children and Mother in September of 2024, because her inconsistency was adversely affecting them. ***See id.*** at 23, 28-29. Thus, at the time of the termination hearing, Mother had only minimal contact with the Children for over five years and had not

physically seen the Children in nearly two years. *See id.* Therefore, we discern no abuse of discretion in the orphans' court's finding that no parental bond existed between Mother and the Children.

Even if we could charitably infer the existence of a parent-child bond, the record also corroborates the orphans' court's conclusion that any parental bond between Mother and the Children was, ultimately, harmful to them. Ms. Croizier provided extensive testimony which established that Mother had consistently struggled with her illegal drug addiction and the resulting criminal consequences throughout the entire length of the Children's dependencies. *See* N.T., 11/6/25, at 12-15, 18-21, 26, 29-30, 33, 46-49. Mother's illegal drug addiction was so pervasive that at the limited supervised, in-person visitation she did attend, she sometimes appeared under the influence. *See id.* at 16-17. Mother also regularly missed scheduled visitations with the Children. *See id.* at 13-17, 19, 22-23, 25-26, 28, 35-37. When Mother failed to appear for visitation, Ms. Croizier explained that G.D. would "become withdrawn" and E.D. would become "aggressive to[wards] anyone around him[.]" *Id.* at 28. Ms. Croizier continued that it "would take both them a few days [until] they would get back to their normal seemingly happy selves." *Id.* at 28-29. Even when Mother did participate in visits, Ms. Croizier stated that E.D.'s behaviors "would get drastically worse following the phone calls" with Mother. *Id.* at 13.

Overall, Ms. Croizier opined that terminating Mother's parental rights best serves the Children's needs and welfare because "she has spent the majority of these five and one half years back and forth between jail and rehab and there is no stability for her." *Id.* at 32-33 (cleaned up). As such, the record indicates that, if Mother had a relationship with the Children, it was not positive, necessary, or beneficial. *See G.W.*, 342 A.3d at 90. Thus, we conclude that the orphans' court did not abuse its discretion with respect to its findings on this point.

The record also reflects that terminating Mother's parental rights would best serve the Children's developmental, physical, and emotional needs and welfare, including, *inter alia*, their stability and permanency. Specifically, Ms. Croizier's testimony established that Mother's behavior created ongoing instability in the Children's foster placements. *See* N.T., 11/6/25, at 10, 13, 15-16. She testified that, upon their removal in July of 2020, the Children were initially placed in kinship care with their maternal aunt. *See id.* at 10. However, after only two days, the maternal aunt requested the Children's removal due to "conflict" with Mother. *Id.* Ms. Croizier explained that the Children were similarly removed from a foster placement in September of 2020 upon the foster parents' request because Mother would not respect the arranged phone contact schedule, sent police to their home for unfounded welfare checks, and told E.D. that he did not have to listen to the foster parents, which caused behavioral problems. *See id.* at 13.

Further, Ms. Croizier stated that between 2022 and 2023, Mother was "calling and harassing" the Children's respective foster parents and E.D.'s school. *Id.* at 24. Specifically, Ms. Croizier testified that Mother would call and text the foster parents from multiple different phone numbers and "threaten to show up at their home or show up at [E.D.]'s bus stop." *Id.* Ms. Croizier also averred that Mother would also call E.D.'s school claiming that he was truant when he was not. *See id.* Ms. Croizier explained that Mother's behavior precipitated the foster parents filing a protection from abuse petition against her as a consequence of this harassment in April of 2023.[7] *See id.* at 24, 45-46. As a result, the juvenile court ordered that the Children's placements be kept confidential beginning in September of 2023. *See id.* at 24-25.

Despite Mother's unstable behavior, the evidence established that the Children were doing well in their respective foster placements. Ms. Croizier testified that CYS placed G.D. with a new pre-adoptive foster family in October of 2025, two weeks prior to the hearing. *See id.* at 41-43. CYS placed E.D. with his current pre-adoptive foster family in December of 2023. *See id.* at 38, 42-43. Ms. Croizier stated that the Children are doing well in their separate placements. *See id.* at 33. Ms. Croizier explained that CYS has

_____

[7] Regarding this petition, Ms. Croizier testified, "I believe there was a temporary order issued[,] but I'm not sure what came following that." N.T., 11/6/25, at 46.

- 17 -

previously worked with G.D.'s new foster parents and they are "really good at recognizing the child[]'s needs and so far he is doing really well in that home." *Id.* She further testified that E.D. "likes his foster parents. He gets along real[ly] well with them." *Id.*

Based upon the foregoing, we discern no abuse of discretion in the orphans' court's determination that the Children's developmental, physical, and emotional needs and welfare were best served by terminating Mother's parental rights pursuant to Section 2511(b). As detailed above, this record is replete with evidence to support that conclusion. Thus, we affirm the termination decrees.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/22/2026